IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| MICHAEL MALVASI,<br><br>    Petitioner,<br><br>vs.<br><br>WARDEN DAVID W. GRAY,[1]<br><br>    Respondent. | CASE NO. 4:24-cv-474<br><br>DISTRICT JUDGE<br>JAMES R. KNEPP II<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**REPORT &<br>RECOMMENDATION** |

Pro se Petitioner Michael Malvasi filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. Doc. 1. Malvasi is in custody at the Belmont Correctional Institution due to a journal entry of sentence in the case *State v. Malvasi*, Mahoning County Court of Common Pleas, Case No. 2018 CR 584. The Court referred this matter to a Magistrate Judge under Local Rule 72.2 for the preparation of a Report and Recommendation. For the following reasons, I recommend that the Petition be dismissed.

**Summary of facts**

In habeas corpus proceedings brought by a person under 28 U.S.C. § 2254, factual determinations made by state courts are presumed correct. 28

---

[1] Shelbie Smith is the Warden at the Belmont Correctional Institution, so Smith is the proper named Respondent. *See Rumsfeld v. Padilla*, 542 U.S. 426, 434–35 (2004).

U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting that presumption by clear and convincing evidence. *Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012).

The Ohio Court of Appeals for the Seventh Appellate District summarized the facts underlying Malvasi's conviction as follows:

> {¶2} On November 18, 2017, just after 2:45 a.m., a white Mercedes crossover SUV, which was registered to Appellant's father, failed to negotiate the second portion of the S-curve heading west on Shields Road (U.S. 62) in Canfield Township. The vehicle left the road, traveled down an embankment, hit a tree, and then rolled at least two times. Ryan Lanzo (the decedent) died at the scene from his injuries sustained in the crash. The state believed he was the front seat passenger and Appellant was the driver.
>
> {¶3} A bystander passed the scene sometime after the crash occurred and called the police. Before the police arrived, a vehicle arrived at the scene, and the decedent's body was retrieved. Appellant's father eventually transported the decedent's body to an Austintown health care center (variously called urgent care or emergency care by witnesses).
>
> ***
>
> {¶5} The case was tried to a jury in July 2021. The decedent's friend, Dante, testified about their night in the hours before the crash. He went to the decedent's apartment where he consumed a mixed drink with Appellant, the decedent, and another friend. (Tr. 257-258). He also observed Appellant and the decedent smoke marijuana. (Tr. 258-259). Dante was originally planning to drive the group to some bars but decided he wanted to drink that night. When he mentioned using the services of Uber to reach the bars, Appellant said not to worry because he would drive. (Tr. 260-261). Dante testified he felt

unsafe in Appellant's white Mercedes on the way to the bar because Appellant had the music on the highest volume, drove aggressively, took a turn at a high speed, and failed to make a complete stop at a traffic signal. (Tr. 262-263).

{¶6} At the first bar (Blue Wolf Tavern), Dante observed Appellant drink a beer; he then spent his time separate from Appellant (as he had just met him that night). (Tr. 266). The decedent drank Long Island iced tea at the bar. (Tr. 282). Eventually, Dante walked next door to another bar (Suzie's Dogs and Drafts).

{¶7} After Appellant arrived at the second bar, Dante saw him have one or two drinks and a shot. (Tr. 270). Near the end of the night, the decedent learned Dante would be getting a ride home from his friend Jackie and asked if he could also obtain a ride from this friend. Dante offered to call the decedent an Uber. (Tr. 270-271).

{¶8} At that point, Appellant said he would be leaving soon and he could take the decedent home. (Tr. 272). Dante suggested the decedent should decline the ride. The decedent replied, "don't worry. Mike's the best drunk driver I know." The decedent and Appellant thereafter walked out of the bar. (Tr. 273).

{¶9} Jackie testified she met Dante at Blue Wolf Tavern at 11:45 p.m. (Tr. 290-291). She said she only had one glass of wine early in the night and noticed the decedent consume three drinks at this bar. (Tr. 290, 293). She opined they left Blue Wolf Tavern for Suzie's Dogs and Drafts around 1:30 a.m. (Tr. 294). She confirmed the decedent asked for a ride at the end of the night and Dante offered to call him an Uber. (Tr. 297). Jackie also heard Appellant offer to drive the decedent home, noting Appellant seemed in a rush to leave. (Tr. 298-301). After Appellant's offer, the decedent unsuccessfully offered to pay people at her table for a ride home. (Tr. 299). She

believed this occurred after the lights came on at last call around 2:30 a.m. (Tr. 301).

{¶10} A patron at Suzie's Dogs and Drafts, Lauren, testified she met Appellant on a prior occasion. When he and the decedent first sat at her table on the night at issue, Appellant seemed intoxicated. Lauren had shots of Crown Royal with Appellant. By the end of the night, he seemed "very intoxicated." (Tr. 318). Lauren was also intoxicated but said it was not to an extreme level. (Tr. 317). When they all got up to leave, Appellant fell into a table, which caused a commotion involving Appellant, the patrons at that table, and security. (Tr. 319). Opining he should not drive, Lauren used Appellant's phone to order him an Uber to his address on Timber Run Drive in Canfield. (Tr. 320-321).

{¶11} Lauren's friend, Macy, testified she watched Appellant drink beer and multiple shots. (Tr. 350). She described Appellant as acting "blacked-out drunk"; he was unable to form a sentence, slurred his words, and was unsteady on his feet. (Tr. 346). Macy said she had one beer at this bar and five beers (or less) during an earlier six-hour period. (Tr. 347). She was concerned because Appellant drove that night and asked Lauren to leave with him and the decedent. (Tr. 351). When she voiced her concerns about Appellant's intoxicated state and asked the decedent to seek a ride with Dante, the decedent said Appellant "is the best drunk driver that he knows." (Tr. 353-355). While watching a bar surveillance video on the stand, Macy pointed out Lauren using Appellant's phone and Appellant falling into a table. (Tr. 364-366).

{¶12} A resident near the scene of the crash testified he fell asleep in his den while watching television and woke at 2:46 a.m. As he stood up, he saw a vehicle heading west around the first S-curve and heard it accelerate. As he turned to leave the room, he heard a lot of noise and then a loud thud. (Tr. 438). He opened the window but could not see or hear anything, noting the crash site sits lower than

4

the roadway. (Tr. 438-439, 441). This witness went to bed and heard about the crash the next morning.

{¶13} A passerby, who described herself as a designated driver, testified she noticed tracks leading off the road and a vehicle in a yard. (Tr. 400-401). After she dropped off her passengers and drove past the scene, she saw a different vehicle parked in a driveway and legs on the ground near the two open doors on the driver's side of the car. (Tr. 403). She stopped at Argus Park and called 911 at 3:12 a.m. (Tr. 403); (St.Ex. 4). She then turned around and drove back past the scene, but the car was no longer in the driveway. (Tr. 406).

{¶14} The first responding officer from the sheriff's department did not notice the crash when approaching from the west but found it after turning around and approaching from the east. They found no victims at the scene of the crashed white Mercedes; the fire department assisted in the search using thermal imaging cameras. (Tr. 382, 385).

{¶15} Because the vehicle was registered to Appellant's father, police officers were dispatched to the Malvasi residence on Timber Run Drive in Canfield, where Appellant lived with his parents. (Tr. 450-451, 854). A Canfield police officer testified he saw Appellant talking on the phone through the front window while another officer knocked on the door around 3:45 a.m. Appellant looked at the officer and then walked away down a hallway. They continued knocking, but the occupants would not come to the door. The officer thereafter saw Appellant peek down the hall. (Tr. 450-454).

{¶16} At 3:52 a.m., Appellant's father arrived at a health center in Austintown, Ohio with the decedent's body; he was driving a four-door Toyota sedan registered in his name. (Tr. 540, 841). There were towels and dark stains on the seat; blood was collected from inside the vehicle and from an object in the trunk. (Tr. 609, 620-621).

5

{¶17} A stipulation was entered into the record which stated the following: Appellant's father was asleep when Appellant woke him; he went outside where the Toyota used by his son was parked in the driveway; the decedent, who appeared unconscious, was in the backseat; and the father immediately drove the vehicle alone to St. Elizabeth's Emergency Care. (Tr. 504).

{¶18} Surveillance footage recovered from a neighboring house on Timber Run Drive showed the garage of the Malvasi residence. This video showed the following events: a car leaving the Malvasi residence at 3:09 a.m.; the car returning at 3:16 a.m.; the car leaving the residence again at 3:40 a.m.; and headlights in the drive at 3:46 a.m. (upon the arrival of the Canfield police). (Tr. 587-593). These times were calculated after the witness found the camera time was four minutes slow. (Tr. 588)

{¶19} A different surveillance video, from the house across from the Malvasi residence, showed the following events in the street: a subject walking toward the Malvasi residence from the west (from the direction of the crash) at 3:06 a.m.; a car heading east (toward the crash) at 3:10 a.m.; a car heading west (toward the house) at 3:16 a.m.; a car heading east (toward the health center) at 3:41 a.m.; and two Canfield police cruisers approaching at 3:45 a.m. (Tr. 579-584). The times were calculated after the witness found the camera time was five minutes fast. (Tr. 505, 575).

{¶20} A business's surveillance camera facing the intersection of Shields Road and Route 46 recorded a figure headed west (from the direction of the crash site toward Appellant's residence) at 2:56 a.m. This footage also showed a vehicle headed east at 3:12 a.m., a vehicle headed west at 3:15 a.m., and a vehicle headed east and turning north (toward Austintown) at 3:42 a.m. (Tr. 699-704). The times were calculated after the witness found the camera time was one hour and eight minutes fast. (Tr. 696).

6

{¶21} Not long after the Canfield police officers left the Malvasi residence upon their unsuccessful attempt to make contact with Appellant, one of the officers returned for a stakeout to ensure Appellant did not leave. A highway patrol trooper, who spoke to Appellant's father at the health center, went to the house after the father called home to inquire about his son's condition and injuries. (Tr. 483, 486-487). At 5:45 a.m., the Canfield police officer knocked on the door accompanied by the trooper. (Tr. 456-457).

{¶22} Appellant's sister answered the door and let them in the house. Appellant's mother and sister used a key to unlock the door to Appellant's bedroom where he was sleeping and groaning. (Tr. 459-460, 488). After Appellant complained of side pain, he was evaluated by an emergency medical technician (EMT) and transported to the hospital. (Tr. 460). The Canfield police officer heard Appellant tell the EMT he smoked marijuana and drank three to four beers plus six shots. (Tr. 462).

{¶23} Two hours later, Appellant spoke to a trooper at the hospital. He identified the decedent and said he had no memory of the crash. He claimed the decedent was the driver, alleging the decedent started driving from the parking lot at Suzie's Dogs and Drafts. (Tr. 846). After a short break in the interview, Appellant said the decedent argued with him about driving while in the bar's parking lot. (Tr. 851). He admitted smoking weed and said his memory was lacking because of all the beer, whiskey, and tequila he drank. (Tr. 852). The trooper testified it took him seven minutes to drive 3.4 miles to the crash site from Suzie's Dogs and Drafts while traveling the speed limit. (Tr. 864). He said the drive from the crash site to Appellant's house takes approximately two minutes. (Tr. 866).

{¶24} The forensic pathologist testified the decedent suffered brain hemorrhaging of various types, a lacerated blood vessel at the heart, lung contusions, a lacerated liver, hemorrhaging in the pleural cavity

and abdomen, and fractured ribs and clavicle. (Tr. 518-519). The external injuries were mostly pre-death abrasions. (Tr. 522-523). She believed he died "seconds to minutes" after receiving the injuries, with five minutes being the maximum. (Tr. 520).

{¶25} An agent from the Ohio Department of Public Safety testified to his review of surveillance videos from the two bars (after the bar owners and their contracted technology representatives testified about providing the videos to law enforcement). (St.Ex. 152, 153). After viewing BMV photographs of Appellant and the decedent, this agent spotted them arriving at Blue Wolf Tavern at 11:46 p.m. (Tr. 640-641). At 12:20 a.m., Appellant was seated at the bar. At 1:24 a.m., Appellant and the decedent exited Blue Wolf Tavern. (Tr. 642). The time on the video was found to be accurate. (Tr. 639).

{¶26} The video from Suzie's Dogs and Drafts shows a white SUV entering the parking lot around 1:30 a.m. (calculated after the agent found the camera time was 14 minutes slow). (St.Ex. 153); (Tr. 651). The agent noted he could see the clothing worn by the driver and passenger as they exited the vehicle and approached the entrance to the bar. (Tr. 651-658). Macy confirmed the identity of Appellant and the decedent (including the clothing worn that night) from the video for the agent. (Tr. 349, 359, 664-665). Jackie identified the two (and their clothing) from still shots taken from the video. (Tr. 303-304). Appellant can be seen in the bar with the decedent and other witnesses.

{¶27} Just prior to exiting the bar, Appellant stumbled into his own table. While walking toward the door, he staggered to the side, knocked over a chair, and landed on a seated male patron while causing the patron's table to move from its position. The decedent had to pull him off the patron. The outside video thereafter shows Appellant and the decedent exit the bar and walk to the white SUV where it can be discerned that the decedent entered the front passenger side of the vehicle and Appellant

8

entered the front driver's side of the vehicle. The agent also testified to this observation. (Tr. 663). The car drove away at 2:39 a.m.

{¶28} The jury also watched videos Appellant posted to Snapchat earlier in the night. (St.Ex. 151). The first video clip had a 9:25 p.m. timestamp and showed Appellant drinking a shot of Crown Royal; the next clip in the sequence showed him do another shot, spilling some down his chin. Another clip was shot from inside a vehicle stopped at a red light with the camera held at a position near the center armrest, which allowed the viewer to see the Mercedes emblem on the steering wheel and the vehicle's clock reading 10:06; the camera then turned to show Appellant singing to the music. (Tr. 713-715).

{¶29} A knit hat with an Arctic Cat logo was found on the driver's seat of the wrecked Mercedes. (Tr. 686-687, 900). The still shot taken from the bar video showed Appellant wearing a knit cap with an emblem on it. (Tr. 900). A phone attributed to the decedent was found between the driver's seat and the driver's door of the Mercedes. (Tr. 594, 613).

{¶30} The accident reconstruction expert testified the crash occurred at the second 45-degree turn heading west on Shields Road after Argus Park. At the curves, there were warning signs, an overhead light, and a suggested speed of 25 mph. (Tr. 744). The expert documented three tire[] marks beginning on the road and leading off the north side of the road into the grass and down an embankment. He explained the tracks showed the vehicle did not drive straight off the road at the curve but tried (and failed) to negotiate the curve. (Tr. 745). He believed the vehicle was traveling at 43 to 45 miles per hour through the crash site if it was not braking and 60 to 65 miles per hour if it had the brakes locked, but he did not believe the brakes were locked due to the curvature of the tire marks. (Tr. 787-788).

{¶31} Ninety feet after the vehicle started through the grass, its right side near the front corner hit a pine tree (standing 17 to 20 feet in height), shearing the tree off at the base and uprooting the stump. (Tr. 746, 748). The vehicle then overturned, striking the ground very hard on its left side and rolling at least twice while in the grass and then probably again over a gravel driveway. (Tr. 746-747, 797-798, 812). Evidence of the overturns included missing tire marks, the gouges in the grass, the debris field, and the condition of the vehicle (including dirt on certain parts of the vehicle and the missing driver's side mirror). (Tr. 747, 830). The vehicle landed upright on its wheels on the other side of the gravel driveway (facing the direction from which it was originally driving on the road). The expert said the debris field and crash scene spanned roughly 280 feet. (Tr. 747).

{¶32} The dashboard showed evidence of impacts with the occupants; their denim pants left imprints, which indicated they were not wearing seatbelts. (Tr. 776). The imprint on the driver's side was under the steering wheel. There was a separate imprint on the passenger side, which seemed to slide up the dashboard (where the glove compartment met the console). (Tr.768-769). The expert explained the occupants were thrown to the left, toward the driver's side, as the vehicle rolled upside down. (Tr. 797-798, 801-802, 813).

{¶33} The side airbags were deployed. The driver's window was missing, but the expert said an ejection through the driver's window during the roll was unlikely due to the door and the deployed side airbag, which had dirt on the outside. (Tr. 749, 798). The rear window was missing, but a cargo cover was crushed into the space, which blocked that potential ejection route.

{¶34} The sunroof was expelled from the top of the vehicle, and there was damage to the left rear sunroof frame. For instance, the fabric around the interior sunroof corner indicated an impact with and abrasion by an object being ejected through the hole

10

> in the roof. (Tr. 750). The outside of this sunroof corner was free of mud and sod, suggesting someone was caught between the roof and the grass as the vehicle rolled. (Tr. 777). One of the injuries running down the decedent's left leg was angled in a shape matching the sunroof's angled support arm. (Tr. 775-777). The spacing between the injuries at the bottom of the decedent's leg and pant leg corresponded to the layout of the sunroof frame. (Tr. 782, 798-799). The expert opined to a reasonable degree of scientific certainty the decedent had been in the passenger seat and was then thrown to the left through the sunroof. (Tr. 797).

*State v. Malvasi*, 203 N.E.3d 823, 827–32 (Ohio Ct. App. 2022).

### Procedural background

*Trial court proceedings*

In June 2018, the Mahoning County Grand Jury issued an indictment charging Malvasi with aggravated vehicular homicide, vehicular homicide, two counts of not stopping after an accident, tampering with evidence, and operating a vehicle impaired. Doc. 8-1, at 3–5 (Exhibit 1).[2] Malvasi retained counsel and pleaded not guilty. *Id.* at 6 (Exhibit 2).

Malvasi filed two motions to suppress. In the first motion, he moved to suppress his blood-draw results and statements that he made to the police. Doc. 8-1, at 8–12 (Exhibit 4-A). In the second motion, he moved to suppress all of the evidence and testimony related to the police searches of his cell phone records, Snapchat account, and the Mercedes. *Id.* at 149–54 (Exhibit 4-C). The

---

[2]    In this report and recommendation, all of the citations to the docket refer to the ECF document and page number shown at the top of the page.

11

court sustained the first motion as to Malvasi's blood-draw results but overruled the motion as to Malvasi's statements. *Id.* at 188–90 (Exhibits 4-E, 4-F). The court overruled the second motion. *Id.* at 188–99.

Malvasi filed a motion for a *Daubert* hearing[3] to challenge the reliability of the State's accident reconstructionist. Doc. 8-1, at 191–92 (Exhibit 5-A). The court held a hearing, Doc. 8-2, at 199–252, and overruled Malvasi's motion to exclude the reconstructionist, Doc. 8-1, at 239 (Exhibit 6).

The case proceeded to trial, and the jury found Malvasi guilty on all counts.[4] Doc. 8-1, at 240–41. The trial court sentenced Malvasi on each of the counts; ordered some of the sentences to run concurrently and some of them to run consecutively; and sentenced Malvasi to an aggregate term of 12 years in prison and a mandatory lifetime driver's license suspension. *Id.* at 242–44.

*Direct appeal*

Malvasi, through new counsel, appealed to the Ohio court of appeals. Doc. 8-1, at 245–46 (Exhibits 9, 10). In his brief, he raised the following assignments of error:[5]

> 1. The trial court erred in permitting Trooper Christopher Jester to testify concerning his opinion that Appellant had been driving the car at the time

---

[3]  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

[4]  One of the not "stopping after accident" counts was "decreased to a third-degree felony due to a special finding that Appellant did not know the accident resulted in a death when he left the scene." *Malvasi*, 203 N.E.3d at 832–33.

[5]  In this report and recommendation, Malvasi's grounds for relief are reproduced as written.

> of the accident and the decedent had been a
> passenger in the car.
>
> 2. The trial court erred and abused its discretion by
> permitting various witnesses to testify that the
> decedent stated that Appellant was the "best drunk
> driver" he knew.
>
> 3. The trial court erred and abused its discretion by
> giving a flight instruction to the jury over the
> objections of Appellant.
>
> 4. Appellant's convictions are against the manifest
> weight of the evidence.

Doc. 8-1, at 249. On December 14, 2022, the Ohio court of appeals affirmed the

trial court's judgment. *Id*. at 307–31 (Exhibit 12).

On January 30, 2023, Malvasi appealed to the Ohio Supreme Court. Doc.

8-1, at 333. In his memorandum in support of jurisdiction, Malvasi set forth

the following propositions of law:

> 1. A trial court peers by permitting a witness to give
> opinion testimony concerning the details of an
> automobile accident when the witness is not
> qualified to do so.
>
> 2. A trial court errs and abuses its discretion by
> permitting various witnesses to testify that the
> decedent stated that Appellant was the "best drunk
> driver" he knew.
>
> 3. A trial court errs and abuses its discretion by
> giving a flight instruction to the jury where the
> evidence reveals that the defendant left the scene of
> an accident to obtain medical assistance for another.
>
> 4. Appellant's convictions are against the manifest
> weight of the evidence.

*Id*. at 336 (Exhibit 14). On March 14, 2023, the Ohio Supreme Court declined

under its rule of practice 7.08(B)(4) to accept jurisdiction of Malvasi's appeal.

*Id.* at 353 (Exhibit 16).

> *Federal habeas corpus petition*

Malvasi states that on February 29, 2024, he placed in the prison mailbox his federal habeas corpus petition under 28 U.S.C. § 2254.[6] Doc. 1, at 9. He raises the following grounds for relief:

> **Ground one**: The trial court peers by permitting a witness (trooper Christopher Jester) to give an opinion testimony concerning the details of an automobile accident when the witness is not qualified to do so.
>
> *Supporting facts*: The Appellant asserts that the central issue in the case concerning whether or not petitioner was driving the Mercedes in question at the time of the accident. In that regard, the prosecutor presented testimony of an alleged expert witness to reconstruct the accident and determine who was sitting where. This was done over the objection of Petitioner, both in the form of a Daubert motion and hearing, and an objection at trial. Petitioner submits that the trial court committed reversible error by permitting this testimony.
>
> **Ground two**: The trial court erred and abused its discretion by permitting various witnesses to testify that the decedent stated that Appellant was the best drunk driver he knew.
>
> *Supporting facts*: The Petitioner asserts that over objection of trial counsel, several witnesses were permitted to testify that the decedent had stated that Petitioner was the best drunk driver that he knew. At one point during the trial, the parties argued the merits of Petitioner's objections in this

---

[6]     A petition is deemed filed when a petitioner places it the prison mailing system. *Houston v. Lack*, 487 U.S. 266, 270 (1988).

14

regards. Petitioner argued that the statements violated the hearsay rules of evidence.

**Ground three**: The trial court errors and abuses its discretion by giving a flight instruction to the jury where the evidence reveals that the defendant left the scene of an accident to obtain medical assistance for another.

*Supporting facts*: The Petitioner asserts that the prosecutor sought and obtained a flight instruction, over the objection of Petitioner. Petitioner argued that this unsupported fact indicated that Petitioner walked from the scene of the accident to his home, took his father's other vehicle to retrieve the decedent, did so, and returned home to have his father take the decedent to the hospital. The record is devoid of any indication that Petitioner left the scene in order to avoid apprehension and, in fact, the evidence actually reveals that police authorities knew the identity of Petitioner immediately upon commencing their investigation.

Doc. 1, at 6–7. The Warden filed a Return of Writ. Doc. 8. Malvasi has not filed a Traverse and the time to do so has passed.

**Legal Standard**

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104–132, 110 Stat. 1214, petitioners must meet certain procedural requirements to have their claims reviewed in federal court. *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 430 (6th Cir. 2006). "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." *Daniels v. United States*, 532 U.S. 374, 381

15

(2001). Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Failure to exhaust applies when state remedies are "still available at the time of the federal petition." *Id.* (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)). But when state court remedies are no longer available, procedural default rather than exhaustion applies. *Id.*

*Exhaustion*

A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A). A state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action. 28 U.S.C. § 2254(b),(c); *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) ("Federal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts") (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)). A constitutional claim for relief must be presented to the state's highest court to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990). And a habeas petitioner must present both the factual and legal underpinnings of the claims to the state courts. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). This means that the "petitioner

16

must present his claim to the state courts as a federal constitutional issue—not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).

*Procedural default*

Procedural default may occur in two ways. *Williams*, 460 F.3d at 806. First, a petitioner procedurally defaults a claim by failing "to comply with state procedural rules in presenting [the] claim to the appropriate state court." *Id*. In *Maupin v. Smith*, the Sixth Circuit directed courts to consider four factors when determining whether a claim is barred on habeas corpus review due to a petitioner's failure to comply with a state procedural rule: whether (1) there is a state procedural rule applicable to the petitioner's claim and whether the petitioner failed to comply with that rule; (2) the state court enforced the procedural rule; (3) the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) the petitioner can demonstrate cause for failing to follow the rule and actual prejudice by the alleged constitutional error. 785 F.2d 135, 138 (6th Cir. 1986); *see also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

17

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams*, 460 F.3d at 806 (citing *O'Sullivan*, 526 U.S. at 848). "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Id*. While the exhaustion requirement is satisfied because there are no longer any state remedies available to the petitioner, *see Coleman v. Thompson*, 501 U.S. 722, 732 (1991), the petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims that bars federal court review, *Williams*, 460 F.3d at 806.

To overcome a procedural bar, petitioners must show cause for the default and actual prejudice that resulted from the alleged violation of federal law that forms the basis of their challenge, or that there will be a fundamental miscarriage of justice if the claims are not considered. *Coleman*, 501 U.S. at 750.

*Merits review*

If a state's courts adjudicated the merits of a claim, a habeas petitioner may obtain habeas relief under 28 U.S.C. § 2254, if the petitioner can establish one of two predicates. To establish the first predicate, the petitioner "must identify a 'clearly established' principle of 'Federal law' that" has been established by a holding of the Supreme Court. *Fields v. Jordan*, 86 F.4th 218, 231 (6th Cir. 2023) (en banc); *see* 28 U.S.C. § 2254(d)(1). The petitioner must

18

then show that state's court's adjudication "was *contrary to*," or "involved an *unreasonable application* of" that "clearly established" precedent. 28 U.S.C. § 2254(d)(1) (emphasis added); *see Fields*, 86 F.4th at 232.

To establish the second predicate, the petitioner must show that the state's court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the [United States Supreme] Court on a question of law or" based on "a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A]n 'unreasonable application of'" the Court's holdings is one that is "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)).

"[A] 'clearly established' principle of 'Federal law' refers to the "holdings," not "dicta," of the Supreme Court's decisions. *Fields*, 86 F.4th at 231 (quoting *White*, 572 U.S. at 419). A state court is not required to cite Supreme Court precedent or reflect an "awareness" of Supreme Court cases,

"so long as neither the reasoning nor the result of the state-court decision contradicts" such precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002); *Lopez v. Wilson*, 426 F.3d 339, 358 (6th Cir. 2005). If the Supreme Court has not addressed the petitioner's specific claims, a reviewing district court cannot find that a state court acted contrary to, or unreasonably applied, Supreme Court precedent or clearly established federal law. *Carey v. Musladin*, 549 U.S. 70, 77 (2006); *see White*, 572 U.S. at 426 ("Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.").

In determining whether the state court's decision involved an unreasonable application of law, the Court uses an objective standard. *Williams*, 529 U.S. at 410. "A state court's determination that a claim lacks merit precludes federal habeas review so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011). "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

## Discussion

### *1. Ground one is not cognizable*

In ground one, Malvasi argues that the trial court erred when it permitted the State's expert witness to testify. Doc. 1, at 7. Malvasi asserts that the witness, an accident reconstructionist, was not qualified "to reconstruct the accident and determine who was sitting where." *Id.* He submits that the court made an erroneous ruling over his objection "both in the form of a *Daubert* motion and hearing" and during trial. *Id.*

"[E]rrors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983); *see Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (a federal habeas court does not "reexamine state-court determinations on state-law questions," including the admissibility of evidence). In *Daubert*, the United States Supreme Court held that Federal Rule of Evidence 702 requires a trial judge to ensure that an expert's testimony is relevant and based on a reliable foundation. 509 U.S. at 597. But *Daubert* doesn't apply to state criminal proceedings, so ground one, which rests on Ohio law, is not cognizable. *See Norris v. Schotten*, 146 F.3d 314, 335 (6th Cir. 1998) ("*Daubert* concerned the Federal Rules of Evidence which is not relevant to [the habeas petitioner's] conviction"); *Hale v. Shoop*, No. 1:18-cv-504, 2021 WL 1215793, at *39 (N.D. Ohio Mar. 31, 2021).

"When an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). To rise to the level of a due process violation, a state-court evidentiary ruling must "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996), in turn quoting *Patterson v. New York*, 432 U.S. 197, 202 (1977)).

Here, Malvasi has not shown that the trial court's ruling deprived him of fundamental fairness. The Ohio court of appeals rejected Malvasi's claim as follows:

> {¶37} Before trial, Appellant filed a motion in limine seeking to preclude the opinion of the state's accident reconstruction expert and asking for a pre-trial hearing on the issue. The expert testified at a hearing on October 16, 2021, and the court overruled Appellant's motion. (10/19/20 J.E.). At trial, defense counsel renewed his motion as to the expert, and the court overruled the motion again. (Tr. 730-731).
>
> {¶38} On appeal, Appellant first contends this witness was not properly qualified as an expert in accident reconstruction as required by Evid.R. 702(B). He suggests the witness may have been an expert in accident investigation but lacked sufficient training or experience in accident reconstruction.
>
> {¶39} A witness who testifies as an expert must be "qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony * * *." Evid.R. 702(B). "Neither special education nor certification is necessary to confer expert status upon a witness.

The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function." *State v. Hartman*, 93 Ohio St.3d 274, 285, 754 N.E.2d 1150 (2001). *See also State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶127 (the witness need not be the best witness on the subject to be qualified as an expert).

{¶40} The determination of an expert's qualifications to testify on a particular subject is within the sound discretion of the trial court and reviewable only for an abuse of discretion. *State v. Jones*, 90 Ohio St.3d 403, 414, 739 N.E.2d 300 (2000). Under such standard, the decision is upheld unless it is unreasonable, arbitrary or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶41} At the time of the initial hearing, the expert had been a trooper with the Ohio State Highway Patrol for over 26 years. He was a crime and crash scene reconstructionist with almost 1,500 hours in traffic crash and crime scene training. Of those hours, 868 were specific to traffic crashes, including 40 specific to the placement of occupants or pedestrians during a crash. (Hrg.Tr. 3-5). The expert taught three levels of courses in crash investigation. (Hrg.Tr. 6). He had previously been qualified to testify as an expert in accident reconstruction in Columbiana, Mahoning, and Trumbull Counties. (Hrg.Tr. 5-6).

{¶42} The expert's CV shows he engaged in low level accident reconstruction prior to 2004, at which time he trained in crash reconstruction and began serving as an accident reconstructionist. (St.Ex. 1). He completed over 300 reconstruction cases for local, state, and federal agencies between 2004 and 2017. He also served as a reconstruction training officer for new investigators and developed protocols for the reconstruction unit. His training courses were listed on the CV. At trial, he again reviewed his

qualifications as an expert, noting he was a full-time crash and crime scene reconstructionist since 2012. (Tr. 734-740).

{¶43} As the state points out, the expert's qualifications in accident reconstruction were established to a greater degree than those in a prior case where we found an officer was properly qualified to testify on accident reconstruction. *See State v. Brady*, 7th Dist. Mahoning No. 13 MA 88, 2014-Ohio-5721, 2014 WL 7356781, ¶ 46 (where a police officer of 20 years was assigned to the accident investigation unit for 13 years, took a reconstruction course, and was previously qualified as a reconstruction expert). *See also State v. DeWalt*, 7th Dist. Carroll No. 08 CA 852, 2009-Ohio-5283, 2009 WL 3165615, ¶ 24 (finding a trooper was qualified as an accident reconstruction expert where he took courses on the subject and previously testified as an expert on the subject six times).

{¶44} Here, we have an Ohio State Highway Patrol trooper with a quarter century of accident investigation experience who was trained in reconstruction, worked in the crash and crime scene reconstruction unit since 2004, was a full-time crash and crime scene reconstructionist since 2012, completed reconstructions in over 300 cases, and was previously qualified as an expert in at least three counties. The trial court did not abuse its discretion in finding the state's expert was qualified to testify on accident reconstruction.

{¶45} Appellant next contends the expert's reconstruction methods were not established to be reliable under Evid.R. 702(C) and the principles in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Appellant claims there was no proof the results were subject to replication. He points out the decedent's location in the vehicle at the time of the crash was a central issue in the case. In citing case law on expert testimony, he also mentions the testimony must be relevant and with a probative value that is not

outweighed by the risks of unfair prejudice, confusing the issues, or misleading the jury.

{¶46} An expert's testimony must be based on "reliable scientific, technical, or other specialized information." Evid.R. 702(C). If the testimony reports the result of a procedure, test, or experiment, then it is reliable only if: (1) the theory is objectively verifiable or validly derived from widely accepted knowledge, facts, or principles; (2) the design reliably implements the theory; and (3) it was conducted in a way that will yield an accurate result. Evid.R. 702(C)(1)-(3).

{¶47} In determining whether the opinion of an expert is reliable, the trial court examines whether the expert's conclusion is based on scientifically valid principles and methods, not whether the opinion is correct. *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 611-613, 687 N.E.2d 735 (1998) (reversing the trial court's exclusion of an expert opinion), citing *Daubert*, 509 U.S. at 592-593, 595, 113 S.Ct. 2786. Factors to consider when evaluating the reliability of scientific evidence include whether the theory or technique has been tested and/or subjected to peer review, the potential rate of error, and whether the methodology is generally accepted. *Miller*, 80 Ohio St.3d at 611, 687 N.E.2d 735 (the inquiry is flexible), citing *Daubert*, 509 U.S. at 593-594, 113 S.Ct. 2786.

{¶48} The expert testified the speed calculation is a simple, long-standing concept taught in basic courses (and is even taught in courses that do not rise to the level of accident reconstruction). He explained the equation inputs (for the friction factor of the surface and the distance the vehicle traveled over the surface). (Hrg.Tr. 18). He additionally mentioned using a 3D laser scan and forensic mapping to record the condition of the vehicle and the scene; he also took photographs while he evaluated the vehicle at the scene. (Hrg.Tr. 9, 20-21). The expert explained his knowledge, gained from training and experience, that ejection from a vehicle

likely leaves evidence at the edges of the opening, such as the fabric abrasion at the corner of the sunroof. He also explained how clothing imprint marks are left on a dashboard from an impact during a crash, noting this is a common occurrence on the inside and outside of vehicles when a person collides with a vehicle surface at high velocity. (Hrg.Tr. 23-25).

{¶49} The accident reconstruction expert said his methods, techniques, equations, and tools were generally accepted throughout the world in the field of accident reconstruction and investigation and were not unique. (Hrg.Tr. 31). Moreover, his report was subjected to peer review by a supervisor in order to lower the error rate and verify the conclusions such as the rolling of the vehicle. (Hrg.Tr. 30, 47, 49). At trial, he reiterated much of his experience and the process utilized. In addition, the evidence he relied on was viewable by the fact-finder in photographs and in maps he was trained to make (including the damage to and features of the outside and inside of the vehicle, the tire marks and gouges in the ground, the debris field, and the damage to the clothing and skin).

{¶50} Merely because the expert could not say the accident "absolutely" occurred as he described or could not say a future accident would always happen in this same manner did not mean the reconstruction opinion was unreliable as to this particular accident considering all of the circumstances before the expert. Moreover, the consideration of reproducible results relates to the conclusion of an expert who employs a test or method for the facts at issue. The final interpretation of all existing data was not an experiment; nor was it a test in and of itself. We also note the expert voiced his conclusion to a reasonable degree of scientific certainty. A "reasonable certainty" is synonymous with "probability" not absolutes. *State v. Jackson*, 92 Ohio St.3d 436, 751 N.E.2d 946 (2001). In fact, "expert witnesses in criminal cases can testify in terms of possibility

26

rather than in terms of a reasonable scientific certainty or probability." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 77 (applying the probability standard only to civil cases is constitutionally sound), citing *State v. D'Ambrosio*, 67 Ohio St.3d 185, 616 N.E.2d 909 (1993). Issues with the certainty of the scientific opinion are matters of sufficiency or weight of the evidence. *Id.*

{¶51} Appellant also briefly complains the expert failed to mention whether the occupants could have dislodged from their seats before the vehicle impacted the tree or evaluate whether the side airbags could have inadvertently deployed before the impact, noting there was a front airbag recall based on inadvertent deployment. He also says the expert failed to consider the tree strike in making certain conclusions, such as on trajectory. As to the latter argument, we note the trajectory was supported by evidence such as tracks, ground gouges, debris field, and vehicle condition and position. Also, the expert explained the general equation was based on friction without accounting for strikes; it was not some omission on his part. (Hrg.Tr. 41). The other subjects involve unsupported theories raised by Appellant at trial. These were topics for cross-examination and for the jury in weighing the evidence. For instance, there is no indication a front airbag recall (issued for inadvertent deployment of a front airbag) had any relation to the deployment of the side airbags in this case (where the front airbags were not deployed). Again, the credibility of the expert and the weight to give his conclusions remained issues for the trier of fact. *Brady*, 7th Dist. No. 13 MA 88 at ¶ 45.

{¶52} The trial court reasonably found the expert's opinion was reliable under Evid.R. 702(C), and the decision was not arbitrary or unconscionable. Moreover, the testimony was relevant under Evid.R. 401, and the probative value was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury

27

under Evid.R. 403(A). In sum, the trial court's decision to find the trooper was qualified to testify as an expert in accident reconstruction and to allow him to testify about the accident and the decedent's location in the vehicle was not an abuse of discretion. Accordingly, this assignment of error is overruled.

*Malvasi*, 203 N.E.3d at 833–36.

"[A]s a state evidentiary matter, [Malvasi] presents no reason for this court to believe [that the expert's] testimony was admitted in error nor any reason to believe that this testimony denied [him] a fundamentally fair trial." *See Norris*, 146 F.3d at 335. Ground one is not cognizable.

2. *Ground two is not cognizable, and, alternatively, fails on the merits*

In ground two, Malvasi alleges that the trial court erred when it permitted witnesses to testify at trial that they heard the decedent state that Malvasi "was the best drunk driver he knew." Doc. 1, at 6. The Ohio court of appeals considered this claim as follows:

{¶54} As set forth supra in our Statement of the Case, the decedent asked for a ride home from people other than Appellant at the end of the night. Dante was getting a ride home from Jackie, but he offered to summon an Uber for the decedent. At that point, Appellant said he could transport the decedent and would be leaving soon. Dante suggested the decedent should decline the ride. The defense unsuccessfully objected when Dante quoted the decedent as follows: "don't worry, Mike's the best drunk driver I know." The decedent and Appellant thereafter walked out of the bar. (Tr. 270-273).

{¶55} Macy separately voiced her concerns about the decedent's ride home due to Appellant's intoxication. She testified over objection that the decedent told her Appellant was going to drive them. The court

28

overruled the objection after the state pointed out it showed the decedent's intent. The state then asked Macy what gave her the impression Appellant would be the driver. The court overruled another defense objection, allowing Macy to testify the decedent told her "[Appellant] is the best drunk driver that he knows." (Tr. 353-354).

{¶56} Appellant contends the statement about Appellant being "the best drunk driver" the decedent knew was inadmissible hearsay. He also claims the prejudicial effect outweighed the probative value under Evid.R. 403.

{¶57} We begin by pointing out the decedent's statements to his friends before leaving the bar were non-testimonial; the primary purpose of the statements was not to create an out-of-court substitute for trial testimony. *See State v. Ash*, 7th Dist. Monroe No. 16 MO 0002, 2018-Ohio-1139, 108 N.E.3d 1115, ¶ 72-75 (victim's statements to relatives), citing *Ohio v. Clark*, 576 U.S. 237, 135 S.Ct. 2173, 2181, 192 L.Ed.2d 306 (2015) (a statement cannot fall within the confrontation clause unless its primary purpose was testimonial); *Giles v. California*, 554 U.S. 353, 376, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008) (statements to friends not subject to confrontation clause); *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 185 (statement of defendant's daughter to the victim's niece was non-testimonial). This non-testimonial description does not appear to be in dispute.

{¶58} Where a non-testimonial statement is admitted, the confrontation clause does not apply, and the matter is left to the application of state rules of evidence such as hearsay rules. *Michigan v. Bryant*, 562 U.S. 344, 358-359, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011). Hearsay, which is generally inadmissible, is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the

matter asserted in the statement." Evid.R. 801(C); Evid.R. 802.

{¶59} As below, the state first claims the statement was not hearsay because it was not offered to show Appellant was the best drunk driver the decedent knew. However, the statement also implicitly indicates Appellant was drunk that night, which was a fact the state was charged with establishing at trial.

{¶60} In any case, the state asserts the contested statement would be admissible under the statement of intent exception to the ban on hearsay, which the state also raised at trial in response to the objection. This exception provides the following type of hearsay is admissible:

> Then Existing, Mental, Emotional, or Physical Condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Evid.R. 803(3).

{¶61} "[S]tatements of current intent to take future actions are admissible for the inference that the intended act was performed." *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 99 (a declarant's statements that he was going to make money and "take somebody out" for the defendant, he had to be ready to go see the defendant, and he would be right back after he picked up some money were admissible under Evid.R. 803(3) to show the declarant intended to meet with the defendant, pick up money, and later kill a person), citing *State v.*

*Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 33 (it is a long-standing rule that a statement of then-existing intent may be used as the basis for introducing statements showing the declarant's forward-looking intent to prove he thereafter acted in accordance with that intent).

{¶62} As the state points out, the contested statement constituted a part of the declarant's stated intent and plan. Without allowing Dante to testify to the statement, Dante could not have disclosed the decedent's declaration of his plan or intent to accept Appellant's offer of a ride and get in the car with him driving. Presented in the context of the conversation about who was driving the decedent that night, the statement was offered to show the decedent intended to ride with Appellant notwithstanding the concerns over his drunkenness. By the time Macy testified, the same statement was already in the record.

{¶63} It was not an abuse of discretion for the trial court to conclude the decedent's reassurances to his concerned friends not to worry because Appellant was the best drunk driver he knew demonstrated the decedent's "current intent to take future actions" and were "admissible for the inference that the intended act was performed." *See Hand*, 107 Ohio St.3d 378, 840 N.E.2d 151 at ¶ 99. As such, the decedent's statements indicating he was accepting Appellant's offer of a ride were admissible under Evid.R. 803(3) to prove he then acted in conformity with his expressed intent.

{¶64} The decedent's intent to get a ride with Appellant notwithstanding his intoxication was certainly relevant evidence. *See* Evid.R. 401 (relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). The admission or exclusion of relevant evidence under Evid.R. 403(A) is within the sound discretion of the trial court. *State v. Skatzes*,

31

104 Ohio St.3d 195, 819 N.E.2d 215, 2004-Ohio-6391, ¶ 107.

{¶65} When an otherwise admissible statement is relevant, it shall be excluded if its probative value was not substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 403(A). The contested statement would not have confused or misled the jury. It was admittedly prejudicial, including the implication that the decedent may have witnessed Appellant drive drunk in the past. Still, it is only unfair prejudice to be weighed against the probative value, as the state's evidence will obviously prejudice a defendant. *Skatzes*, 104 Ohio St.3d 195, 819 N.E.2d 215 at ¶ 107. The jury already heard from Dante that Appellant drove him and the decedent to the bar after Appellant consumed at least one mixed vodka drink and smoked marijuana. Plus, the probative value of the statement evincing the decedent's intent to ride with Appellant was very high. It was reasonable to find the probative value of the statements was not substantially outweighed by the danger of unfair prejudice.

{¶66} Finally, the state also persuasively contends that assuming arguendo there was a hearsay error in admitting the contested statement, any error would have been harmless. Appellant drove the decedent to the bars in a wild manner while driving a Mercedes owned by Appellant's father. As mentioned in reviewing prejudice, the jury already heard from Dante that Appellant consumed at least one mixed vodka drink and smoked marijuana before driving them to the bar. Various witnesses saw him drink more at the bars and watched him act drunk, with his staggering and fall captured on video for the jury. When the decedent sought a ride from people at the end of the night, Appellant specifically declared that he would drive the decedent, and they then left the bar together. Appellant's offer of the ride to the decedent was the defendant's own statement and was thus non-hearsay. Evid.R. 801(D)(2)(a).

{¶67} Moreover, before Macy revealed the "best drunk driver" statement, she had already disclosed the decedent said he would be driven by Appellant that night. In addition, the bar's video (from less than 10 minutes before the crash) showed Appellant entering the vehicle through the driver's door with the decedent entering on the passenger side. With these facts and the remainder of the facts collected in our Statement of the Case, it is clear any error in admitting the alleged hearsay statement would have been harmless as there was overwhelming evidence that Appellant was both intoxicated and the driver. *See State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 32 (even if there was prejudicial error in admitting evidence, the overwhelming other evidence rendered the error harmless). For the various reasons expressed above, this assignment of error is overruled.

*Malvasi*, 203 N.E.3d at 836–39.

Malvasi has not explained why he believes that the Ohio court of appeals' determination—finding non-testimonial under the "primary purpose" test that the decedent's statement to bar patrons that Malvasi was the "best drunk driver [the decedent] knew," *see id*. 836–37—was unreasonable. The Ohio court of appeals applied the relevant law when making its finding, s*ee Ohio v. Clark*, 576 U.S. 237, 244–45 (2015) (expounding on the "primary purpose test"), and its conclusion was reasonable, *see, e.g., Hand v. Houk*, No. 2:07-cv-846, 2011 WL 2446383, at *32 (S.D. Ohio Apr. 25, 2011) (decedent's "statements to his relatives, friends, and acquaintances" without intent "of bearing testimony against [the petitioner]" were non-testimonial), *report and recommendation adopted*, 2013 WL 2372180, at *16 (S.D. Ohio May 29, 2013).

Furthermore, as a non-testimonial statement, "the admissibility of [the] statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *See Clark*, 576 U.S. at 245–46 (quoting *Michigan v. Bryant*, 562 U.S. 344, 359 (2011)). The Ohio court of appeals' resulting application of state law when evaluating Malvasi's claim, therefore, was proper. *See Bryant*, 562 U.S. at 359. And this means that this claim is not cognizable. *See, e.g., Wilbourn-Little v. Morrison*, No. 2:23-cv-11394, 2024 WL 3909360, at *9 (E.D. Mich. Aug. 22, 2024) (petitioner's challenge to the state court's interpretation of state-law hearsay exceptions is not cognizable); *Lash v. Sheldon*, No. 1:19-cv-1616, 2020 WL 6712165, at *18 (N.D. Ohio Oct. 20, 2020) (same, citing cases), *report and recommendation adopted sub nom. Lash v. Turner*, 2020 WL 6702051 (N.D. Ohio Nov. 13, 2020). And Malvasi hasn't shown that the trial court's state-law evidentiary ruling "offend[s] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *See Seymour*, 224 F.3d at 552. So ground two is not cognizable.

Even if the decedent's statement was testimonial and erroneously admitted, which it was not, the Ohio court of appeals properly applied harmless error review. *See Malvasi*, 203 N.E.3d at 838–39 (applying harmless error review to any purported error the trial court may have made when admitting the decedent's statement); *see also Blackston v. Rapelje*, 780 F.3d 340, 359 (6th Cir. 2015) ("A violation of the Confrontation Clause does not

warrant automatic reversal but, rather, is subject to harmless-error analysis.")
(citing *Delaware v. Van Arsdall*, 475 U.S. 673, 681–82 (1986)). Malvasi doesn't
identify what about the Ohio court of appeals' harmless error analysis he
believes was an unreasonable application of United States Supreme Court
precedent. He hasn't persuaded me that this Court should "harbor grave doubt
about [his] verdict," *see Brecht v. Abrahamson*, 507 U.S. 619 (1993), or that
"every fairminded jurist would agree that an error was prejudicial," *see Brown
v. Davenport*, 596 U.S. 118, 134, 136 (2022) (explaining that, to prevail on
harmless error, a federal habeas petitioner must satisfy both the AEDPA
standard and the *Brecht* test).

Ground two is not cognizable and, alternatively, fails on the merits.

### 3. Ground three is procedurally defaulted and not cognizable

In ground three, Malvasi argues that the trial court erred when it gave
a flight instruction to the jury. Doc. 1, at 7.

"Before seeking a federal writ of habeas corpus, a state prisoner must …
giv[e] the State the opportunity to pass upon and correct alleged violations of
its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal
quotation marks and citations omitted). To do so, the prisoner must "fairly
present" the claim to the state court, "thereby alerting that court to the federal
nature of the claim." *Id*.; *Koontz*, 731 F.2d at 368 (a habeas petitioner "must
present his claim to the state courts as a federal constitutional issue—not
merely as an issue arising under state law").

Here, Malvasi only presented this ground for relief to the Ohio courts as a state law violation. He did not allege a federal constitutional violation. *See* Doc. 8-1, at 248–49, 261–63 (brief on appeal to the Ohio court of appeals); 348–49 (memorandum in support of jurisdiction on appeal to the Ohio Supreme Court). Malvasi's briefs relied on Ohio case law and Ohio jury instructions, and the Ohio case that he cited relied, in turn, on other Ohio cases and Ohio jury instructions. *See id.* (citing *State v. Keller*, No. 106196, 2018 WL 4933198, at *10 (Ohio Ct. App. Oct. 11, 2028)); *see Baldwin*, 541 U.S. at 33 ("The petition provides no citation of any case that might have alerted the court to [any purported] alleged federal nature of the claim"). Because Malvasi failed to present ground three to the Ohio courts as a federal constitutional violation, it is procedurally defaulted.

Malvasi has not asserted cause or prejudice to excuse his procedural default, or shown that his is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986); *see Schlup v. Delo*, 513 U.S. 298, 324 (1995) (a claim of actual innocence "requires the petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.").

Ground three is also not cognizable. "[T]he fact that the [jury] instruction was allegedly incorrect under state law is not a basis for habeas

36

relief." *Estelle*, 502 U.S. at 71–72. To prevail on federal habeas review, a petitioner must show that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id*. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

Malvasi has not made such a showing. As the Ohio court of appeals explained:

> {¶69} Defense counsel objected to a flight or consciousness of guilt instruction before the jury was charged. The court overruled the objection and gave the following jury instruction:
>
>> Testimony has been admitted indicating that the defendant fled the scene. You are instructed that fleeing the scene alone does not weigh the presumption of guilt, but it may tend to indicate the defendant's consciousness of guilt.
>>
>> If you find that the facts do not support the defendant leaving the scene or if you find that some other motive prompted their conduct, or if you find that, or if you are unable to decide what his motive was, then you should not consider this evidence for any purpose.
>>
>> However, if you find that the facts support that the defendant engaged in such conduct, and you decide that it was motivated by consciousness of guilt you may, but are not required to consider that evidence in deciding whether or not he is guilty of the crime charged. You alone will determine what weight, if any, to give to this evidence.

(Tr. 979-980).

{¶70} A trial court's decision to provide a particular jury instruction based upon the facts of the case will not be reversed absent an abuse of discretion, requiring the decision to be unreasonable, arbitrary or unconscionable. *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989). It is well-established "that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." *State v. Williams*, 79 Ohio St.3d 1, 11, 679 N.E.2d 646 (1997). Clearly, flight from a crash scene qualifies as a type of flight. *State v. Miller*, 7th Dist. Mahoning No. 13 MA 12, 2014-Ohio-2936, 2014 WL 2999192, ¶ 139 (fleeing the scene instead of calling for ambulance), citing *State v. Eaton*, 19 Ohio St.2d 145, 160, 249 N.E.2d 897 (1969) ("Flight from justice, and its analogous conduct, have always been indicative of consciousness of guilt"), overruled in part on other grounds, *Eaton v. Ohio*, 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 750 (1972) (vacating death penalty).

{¶71} Appellant argues a flight instruction was not warranted because he merely left the scene, claiming he took no affirmative step to avoid the police. He relies on the following Eighth District holding: "a flight instruction should not be given when a defendant merely departs from the scene of a crime, unless deliberate flight is proven, such that the defendant took affirmative steps to avoid detection and apprehension." *State v. Keller*, 8th Dist. Cuyahoga No. 106196, 2018-Ohio-4107, 2018 WL 4933198, ¶ 63. The court distinguished between mere departure from the scene and fleeing from the scene, which is a deliberate act of avoiding detection or evading the police. *Id.* at ¶ 63-64. Although the Eighth District found the instruction should not have been given, the court then found a lack of prejudice to the defense and affirmed the conviction. *Id.* at ¶ 65-66.

38

{¶72} The facts of the *Keller* case have no similarity to the case at bar. The victim in *Keller* said: she was drinking at various places with the defendant and others; she passed out at 6:00 a.m. next to the defendant on the couch at her friend's house; the defendant raped her while she was passed out; he was sleeping when she woke up to her alarm; and he left the house while she was in the bathroom. That defendant testified the sex was consensual and he left after waking up at 9:00 a.m. because he was embarrassed (with the victim's boyfriend sleeping on the other couch).

{¶73} Here, Appellant did not merely depart from the scene of an accident involving a vehicle owned by his father. There was evidence he used the vehicle to drive to bars that night after he had an alcoholic drink and smoked marijuana; there was also evidence he drank at two bars and was intoxicated at the end of the night at the final bar. His friend was fatally injured in the accident, but he did not call 911 or seek assistance from the nearby houses. Instead, he walked or ran quite a distance to reach his house. According to video evidence, it took him ten minutes to walk to his house from the Route 46 intersection. This was in addition to the walk from the crash site to that recorded intersection, which seemed to be a similar distance. Then, when Appellant arrived home, he still did not call 911. Instead, he obtained another vehicle to drive back to the scene where he dragged the decedent's body into his vehicle and left the scene a second time. Appellant then went home again where the body stayed for 25 minutes in his car (until his father drove the car to an emergency care center).

{¶74} Furthermore, the police arrived at Appellant's house mere minutes after his father left. When they knocked, Appellant was in the kitchen. Appellant looked at the officer through the window and walked away down a hallway instead of answering the door. He peeked around the corner at the officer minutes later, still refusing to answer the door despite ten minutes of knocking. The police subsequently

39

learned of the fatality after the father reached the emergency center.

{¶75} Collectively, the situation was more than mere departure from a scene; there was evidence of deliberate acts of evasion, concealment, and delay (potentially in order to provide time to come up with a story or to postpone alcohol testing). The reason behind Appellant's departure from the scene and related conduct thereafter was a jury question. It was not an abuse of discretion to conclude that Appellant's conduct could rationally be viewed as constituting flight or "analogous conduct" after crashing a vehicle while under the influence, warranting a consciousness of guilt instruction. *See Eaton*, 19 Ohio St.2d at 160, 249 N.E.2d 897.

{¶76} Moreover, the jury was specifically instructed that if the defendant's conduct of leaving the scene was prompted by some motive other than consciousness of guilt, then they should not consider the conduct. In formulating the jury instructions, the court was not required to accept the theory from Appellant's opening statement that he was merely "stupid" by trying to "help" his friend in this manner (or his claim to a trooper that he was not the driver). The court did not abuse its discretion in providing the consciousness of guilt instruction on flight. The instruction would not have prejudiced the defense in any event under the totality of the evidence as reviewed in our Statement of the Case and throughout this Opinion; contrary to his argument, the other evidence showing he was the driver was not weak but was overwhelming. This assignment of error is overruled.

*Malvasi*, 203 N.E.3d at 839–40. Because Malvasi hasn't shown that a constitutional violation occurred, he is not entitled to relief. *See Estelle*, 502 U.S. at 72.

**Conclusion**

For the reasons set forth above, I recommend that Malvasi's Petition be dismissed.

Dated: September 25, 2024

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).